1   **Jaburg & Wilk, P.C.**
    3200 N. Central Avenue, 20th Floor
2   Phoenix, AZ 85012
    602.248.1000
3
    Maria Crimi Speth (012574)
4   mcs@jaburgwilk.com
    Laura Rogal (025159)
5   lar@jaburgwilk.com
    Michael B. Dvoren (027386)
6   mbd@jaburgwilk.com
    Aaron K. Haar (030814)
7   akh@jaburgwilk.com

8
    Attorneys for Plaintiffs/Counterdefendant
9

10

11                    **IN THE UNITED STATES DISTRICT COURT**

                         **FOR THE DISTRICT OF ARIZONA**
12

13   IOW, LLC, an Arizona limited liability        Case No. 2:18-cv-01649-DGC
     company; WHEN Enterprises Corp. a
14   Delaware corporation,
                                                    **Response To Defendants' Motion For**
15                  Plaintiffs,                     **Summary Judgment On Plaintiffs'**
                                                    **Claims**
     v.
16
                                                    (Assigned to the Hon. David G. Campbell)
17   Michael Breus and Lauren Breus,
     husband and wife; Hachette Book
18   Group, Inc., a New York corporation;
     Little, Brown and Company, a New
19   York corporation,

20                  Defendants.

21   Michael Breus and Lauren Breus,
     husband and wife,
22
                    Counterclaimants,
23
     v.
24
     WHEN Enterprises Corp., a Delaware
25   corporation,

26                  Counterdefendant.

19596-19596-00001\LAR\MCS\3482152.2

Michael Breus and Lauren Breus's summary judgment should be denied because the case is rife with factual disputes. "Courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Zetwick v. County of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656, 134 S.Ct. 1861, 1866, 188 L.Ed.2d 895 (2014) (per curiam)).

Under the cloak of a NDA, Dr. Breus was privy to a veritable encyclopedia of how to formulate self-help training and education programing, and to the myriad of catchy phrases, brands, logos and coined terms all focused on the word and concept of WHEN. Most pointedly, Randy Miller disclosed in confidence the term "Power of When" which then ended up on the cover of Breus's book.

Breus has taken the position that despite receiving this vast compendium on the WHEN business model, he in "no way" utilized that information when he just so happened to author a book using the ***exact same name*** as one of Plaintiffs' anticipated trademarks. Is it believable that Breus just completely ignored the ideas given to him by Plaintiffs about the WHEN business model, including the phrase "Power of When," and just somehow ended up writing a book using the same name during that same time period? Or is it more believable that Breus played upon the goodwill of Plaintiffs and absconded with trade secrets for his own personal financial wellbeing? It is "clear that the court must not make any credibility determinations" when considering a summary judgment motion. *Schlup v. Delo*, 513 U.S. 298, 332, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ("[A] district court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented.") (quoting *Agosto v. INS*, 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978)).

## I.     The Majority Of Facts Are Subject To Legitimate Dispute

As the nonmoving party, Plaintiffs will readily demonstrate a dispute "over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty*

JABURG|WILK
Attorneys at Law

1   *Lobby Inc*., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). These disputes

2   are genuine, because "the evidence is such that a reasonable jury could return a verdict

3   for the nonmoving party." *Id*., 477 U.S. at 248, 106 S.Ct. at 2510.

4         Randy Miller, the sole member of IOW and the majority shareholder of When

5   Enterprises Corp. ("WEC") and Dr. Breus formed a business and personal relationship

6   in October 2013, (PSOF, ¶ 18), *after* Miller conceived of and commissioned a

7   trademark availability search of the phrase "Power of When" and after the formation of

8   IOW by Miller in July 2013 to provide consulting services to the public related to

9   health, personal wellbeing and career advancement. (PSOF, ¶ 18).

10        In December 2013, Miller introduced Breus to the WHEN® program and invited

11  him to participate in the development and marketing of the concept. (PSOF, ¶ 19).

12  Based on agreed-upon expectations of their responsibilities, the parties executed a

13  Confidentiality Agreement (the "NDA") in about January 10, 2014. (PSOF, ¶21). For

14  more than two years, Breus and Miller collaborated on the WHEN business model.

15  (PSOF, ¶ 26). During the course of their relationship, Miller also provided coaching and

16  assistance to Breus. (PSOF, ¶ 27). The two engaged in various lunch and dinner

17  meetings, family dinners ongoing text communication and extensive email traffic.

18  (PSOF, ¶ 28). As part of their business relationship, and pursuant to the NDA, Breus

19  received extensive confidential information concerning the WHEN® programs, service

20  levels, coined words and phrases, anticipated branding, and business model that was

21  being built for the personal growth and wellness sector. (PSOF, ¶ 29, 31, 53, 54). This

22  information included financial statements and forecasts, private investor review,

23  corporate partnering information, information concerning the delivery of services,

24  methodologies and processes employed by the business's trained advisors, and

25  confidential information related to the WHEN® business model including the unique

26  combination of holistic health, wellbeing and career-related services offered under the

1    program that was not yet launched or public. (PSOF, ¶ 30). Miller also shared with

2    Breus the various confidential branding phrases that Plaintiffs intended to use which

3    incorporated the word "when," including the phrase POWER OF WHEN. (PSOF, ¶ 19).

4        Throughout all meetings and communications with Plaintiffs, Breus expressed

5    significant interest in the business of WHEN®. (PSOF, ¶ 31). Miller was building a

6    team that Breus wanted to be part of. (PSOF, ¶ 32). The two also discussed Breus

7    contributing to Miller's book, "WHEN Volume I," a compilation from a series of

8    authors focused on career and spiritual wellbeing, but after committing to contribute a

9    chapter, Breus backed out and surreptitiously decided to write his own "When" book.

10   (PSOF, ¶ 33). Breus did, however, contribute an endorsement quote that was printed on

11   the back cover. (PSOF, ¶ 34).

12       The relationship between Breus and IOW quickly soured on January 12, 2016,

13   when Breus told Miller that he was intending to publish a book entitled "The Power Of

14   When." (PSOF, ¶ 35). Given the similarity in names between Plaintiffs' various

15   WHEN® program phrases, including "Power of When," which was being used as a

16   service moniker, Miller was justifiably upset about Breus' unilateral decision to publish

17   something with a title ripped from IOW's confidential business plans. (PSOF, ¶ 36).

18       A few months later, in September 2016, Breus released his book *The Power of*

19   *When*. (PSOF, ¶ 37). Breus later used the trademark THE POWER OF WHEN to

20   promote online courses and sleep-related product, including a website using the URL

21   www.thepowerofwhen.com, with an online quiz that is used to capture email addresses

22   and promote other products. (DSOF, ¶¶24-27; PSOF ¶63). The synopsis of Breus's

23   book *The Power of When* begins, "Most advice centers on *what* to do, or *how* to do it,

24   and ignores the *when* of success." (PSOF, ¶ 38). The first page of the Book suggests it

25   can help the reader get "closer to happiness and success," and lists several topics related

26   to health, career, and wellbeing. (PSOF, ¶ 39). Breus's *The Power of When* states:

JABURG|WILK
Attorneys at Law

3

> "What" and "how" are excellent and necessary questions. But **there is another crucial question that *must* be addressed in order to make fast, dramatic, lasting improvements in the quality of your life across the board.**
>
> **That question is "when."**
>
> *"When" is the ultimate life hack.* (PSOF, ¶ 40).

Dr. Mehmet Oz provided the forward *The Power of When*, ghostwritten by Breus, which states:

> Knowing and understanding 'when' you function best, and 'when' others function best, allows you to put your best ideas forward, be most creative, and be open to instruction. This book will allow you to learn 'when' you can truly be your best on many levels.

(PSOF, ¶ 41).

## II.   Summary Judgment is Not Warranted on Any of the Claims

### A. <u>IOW Has Standing As Plaintiff</u>

Defendants assert IOW lacks standing because IOW assigned the NDA to WEC before Defendants named and published the book. This argument fails because the rights and obligations under the NDA extend to affiliates of the parties under common control. The NDA provides for the confidentiality of information disclosed from the "Owner" to the "Recipient." The NDA defines "Owner" and "Recipient" as also including "individually and collectively, the directors, officers, employees, agents and **affiliates** of the parties hereto." (PSOF ¶22). The NDA then defines "affiliate" as "any person or entity controlling, controlled by or under common control with a party." (PSOF ¶ 23). As IOW and WEC were under common control at all relevant times, WEC was covered under the express terms of the NDA and IOW continued to be covered under the terms of the NDA after the inception of WEC and after contributing its assets to WEC.

JABURG|WILK
Attorneys at Law

1    Defendants also argue IOW lacks standing as to the intellectual property claims
2  because "WEC owns all of the alleged intellectual property of the business." But IOW
3  owned the proprietary information and trade secrets and was using the trademarks in its
4  business when Defendants first began their unlawful conduct. IOW may seek to recover
5  its damages for that portion of the unlawful conduct that injured IOW.

6    B. Defendants Are Not Entitled To Summary Judgment On The Claim For
7       Breach Of The Non-Disclosure Agreement (Count One)

8    The first cause of action in the Second Amended Complaint ("SAC") alleges Dr.
9  Breus's breach of the NDA. Plaintiffs have the burden of proving the existence of a
10  contract, breach of the contract, and resulting damages. *Chartone, Inc. v. Bernini,* 207
11  Ariz. 162, 170, 83 P.3d 1103, 1111 (App. 2004).

12    Pursuant to the plain language of the NDA, Dr. Breus was obligated to not
13  disclose any confidential information he received about Plaintiffs or their business
14  practices or future plans. (PSOF, ¶24). He elected to not just disclose, but utilize the
15  confidential materials received from Plaintiffs, which included the confidential
16  proposed trademarks and branding of WHEN selected by Mr. Miller. (DSOF, ¶¶ 8-9;
17  24-25; PSOF ¶¶ 37-41).

18    Among the most critical confidential materials taken by Breus in contravention
19  of the NDA was the then-proposed trademark POWER OF WHEN. On April 15, 2013,
20  at the request of Miller, long before Miller ever met Dr. Breus, Attorney Lance Venable
21  performed a trademark search on POWER OF WHEN. (PSOF, ¶¶ 43). Miller did not
22  file a trademark application at that time for POWER OF WHEN and Miller and Venable
23  considered that phrase to be highly confidential until it was made public in a trademark
24  application on August 28, 2016. (PSOF, ¶¶ 44-45).

25    In addition, *The Power of When* and related marketing materials and programs—
26  beyond simply mimicking the WHEN® program's names and monikers—trades off of

5

JABURG|WILK
Attorneys at Law

the unique ideas associated with the WHEN® program and business model that were shared with Breus. Through his Book and marketing website, Breus is plainly utilizing the same timing-related ideas and models that form the foundation of IOW's business model and findyourwhen® and WHEN® programs—ideas and branded models, including POWER OF WHEN that were shared with him under guise of the NDA, that were not public at the time they were shared with him, and which did not originate with Breus. (PSOF, ¶¶ 30-31; 37-41).

Defendants attempt to explain away Breus's use of the mark POWER OF WHEN by excusing his role in the title of the Book. Their explanations create a serious question of credibility, which cannot be resolved on summary judgment. Defendants have asked the Court to believe that his publisher Tracy Behar independently, and on her own, came up with the title *The Power of When* for the Book. (DSOF, ¶¶ 21; 36-37). This story is rife with holes, given the prior conversations between Breus and his literary agent, Alex Glass,[1] about the title *before* Ms. Behar "suggested" the title of the Book. (PSOF, ¶¶ 59). Also, Breus had a close working relationship with his ghost writer, Val Frankel and it is undisputed that prior to Ms. Behar's supposed invention of the title, Ms. Frankel suggested using *The Science of When.* (PSOF, ¶ 59).

In seeking to establish the existence of a factual dispute, the non-moving party need not establish a material issue of fact conclusively in his favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Giles v. Gen. Motors Acceptance Corp*., 494 F.3d 865, 872 (9th Cir. 2007) (citation omitted). The near identity of the title to a WEC

---

[1] In a June 25, 2015 email, Alex Glass told Tracy Behar that Breus had texted him "with some thoughts" regarding the book's title. (DSOF at p. 40 (Behar Depo attachment HBG0000720)). However, Breus has deleted those texts, thus depriving Plaintiffs from learning what Breus may have said regarding the suggested titles generally and POWER OF WHEN specifically.

6

JABURG|WILK
Attorneys at Law

1   proposed trademark along with the missing text messages that described Breus

2   participating in coming up with a title, creates an issue of fact on who named the book.

3       Even if Breus didn't suggest POWER OF WHEN to his publisher, or his

4   ghostwriter Val Frankel, or his agent, Breus still had a duty to not use the mark POWER

5   OF WHEN because he had an ongoing duty to Plaintiffs pursuant to the NDA. At the

6   exact same time Breus had conversations with his publisher and ghostwriter about

7   naming the book, he was simultaneously receiving emails from Miller about branding

8   terms incorporating the words "Power" and "When" and attempting to dissuade Miller

9   from using tag lines that included "Power" and "When" (PSOF, ¶¶ 47-48). At the very

10  least, there is a question of fact as to whether the NDA created a duty to refrain from

11  using the confidential information Breus received from Plaintiffs. Under either scenario,

12  summary judgment is not proper at this time.

13      C.  <u>Defendants Are Not Entitled To Summary Judgment On The Claim For
14          Breach Of The Covenant Of Good Faith And Fair Dealing (Count Two)</u>

15      The law implies a covenant of good faith and fair dealing in every contract.

16  *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395*

17  *Pension Trust Fund*, 201 Ariz. 474, 490, 74, 38 P.3d 12, 28 (2002). "The covenant of

18  good faith and fair dealing requires that neither party act to impair the right of the other

19  to receive the benefits that flow from their agreement or contractual relationship."

20  *Kuehn v. Stanley*, 208 Ariz. 124, 132, 91 P.3d 346, 354 (App. 2004). For a finding that a

21  party breached the implied covenant of good faith and fair dealing, Plaintiffs need to

22  prove that the actions of Defendants bore adversely on Plaintiffs' reasonably expected

23  benefits of the bargain. *United Dairymen of Arizona v. Schugg*, 212 Ariz. 133, 138, 128

24  P.3d 756, 761 (App. 2006). This is easily shown through the record.

25      In their Motion, Defendants blithely ignore this cause of action, and insist that

26  because there was no breach of contract, this cause of action fails as well. (Motion, p.

JABURG|WILK
Attorneys at Law

7

10). Such argument misapprehends the claims made in the SAC. A covenant of good faith and fair dealing can be breached without the underlying contract itself having been breached. *Wells Fargo Bank* at ¶64.

Breus was made aware – repeatedly – of the insistence of Miller to hold all business activities close to the vest. (PSOF ¶ 25). Yet the actions of Breus, even if not expressly violating the terms of the NDA, still were done to interfere with Plaintiffs' rights in the NDA because Breus acted to compete directly with Plaintiffs while at the very same time, still supposedly collaborating with Plaintiffs under the NDA. This violates the covenant of good faith and fair dealing.

D. <u>Defendants Are Not Entitled To Summary Judgment On The Claim For Misappropriation Of Trade Secrets (Count Three)</u>

Arizona has adopted the Uniform Trade Secrets Act ("UTSA"), which codifies the basic principles of common-law trade-secret protection, to govern the resolution of trade-secret issues." *Enter. Leasing Co. of Phoenix v. Ehmke*, 197 Ariz. 144, 148, 3 P.3d 1064, 1068 (App. 1999). However, Defendants' recitation of the law in their Motion is extraordinarily narrow to avoid the claims actually being made in this case. Plaintiffs have asserted for *years* the  misappropriation of trade secrets to include not just the physical materials provided to Breus, but more intangibles as well such as the general structure of the WHEN® business, along with the proposed trademarks to be used alongside the business. Secrets affording a demonstrable competitive advantage may be properly considered trade secrets. See Roger M. Milgrim, *Milgrim on Trade Secrets* § 1.01[1] 1-18 (2001). To be a trade secret, the information must derive "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use." A.R.S. § 44-401. Since the inception of their relationship with Breus, Plaintiffs made clear that the majority of their business

8

1   information, including the general business model, the specific WHEN® programming,

2   training manuals, and proposed trademarks were all trade secrets belonging to Plaintiffs.

3   (PSOF, ¶¶ 25, 29-30).

4           "Information derives independent economic value from not being generally

5   known when its secrecy 'provides a business with a 'substantial business advantage.''"

6   *Mattel, Inc. v. MGA Entm't, Inc*., 782 F. Supp. 2d 911, 959 (C.D. Cal. 2011) (internal

7   citations omitted). At the time Plaintiffs were developing their business model, no one

8   else was doing what they were proposing. (PSOF, ¶49). This was a revolutionary

9   program that was years in the making, and which would upend the self-help

10  marketplace once it was launched. (PSOF, ¶ 50). Collectively, this formulates the trade

11  secret at issue here. A trade secret may consist of a compilation of information that is

12  continuously used or has the potential to be used in one's business and that gives one an

13  opportunity to obtain an advantage over competitors who do not know of or use it."

14  *Ehmke*, 3 P.3d at 1068 (internal citations omitted).

15          Next, Defendants take the position that a proposed trademark cannot be a secret,

16  because the only time it has value is when it is publicly used. That defies common sense

17  and Defendants have not provided the Court with any law stating why a proposed

18  trademark is not a trade secret. Mr. Venable, a trademark attorney, testified that indeed

19  proposed trademarks are trade secrets until they are made public. (PSOF, ¶ 46).

20  Similarly, courts have found that brand names can, in fact, constitute a trade secret. *See*,

21  e.g., *Mattel, Inc. v. MGA Entm't, Inc*., 782 F. Supp. 2d 911, 963 (C.D. Cal. 2011); *see*

22  *also Morton v. Rank Am., Inc.*, 812 F. Supp. 1062, 1074 (C.D. Cal. 1993). Defendants'

23  attempts to separate the trade secrets given to Breus under the NDA from his actual use

24  of the business information given to him is simply parsing hairs, and isn't enough of a

25  distinction to obtain summary judgment on this cause of action.

26

9

JABURG|WILK
Attorneys at Law

E.  <u>Defendants Are Not Entitled To Summary Judgment On The Claim For Unjust Enrichment (Count Four)</u>

This cause of action is pled in the alternative to the two contract claims and the misappropriation claim. In the event that all three of those claims are found against Plaintiffs, they are still entitled to proceed on this legal theory to remediate the losses caused to Plaintiffs by the actions of Breus.

"In short, unjust enrichment provides a remedy when a party has received a benefit at another's expense and, in good conscience, the benefitted party should compensate the other." *Wang Elec., Inc. v. Smoke Tree Resort, LLC*, 230 Ariz. 314, 318, 283 P.3d 45, 49 (App. 2012). Five elements must be present to make a case of unjust enrichment; (1) an enrichment; (2) an impoverishment; (3) connection between enrichment and impoverishment; (4) absence of justification for enrichment and impoverishment; (5) absence of remedy provided by law. *Community Guardian Bank v. Hamlin*, 898 P.2d 1005,182 Ariz. 627 (App. 1995). Breus benefited from his relationship with Plaintiffs without compensation to Plaintiffs, thereby creating the foundation for this claim.

The doctrine of unjust enrichment is a "flexible, equitable remedy available whenever the court finds that 'the defendant ... is obliged by the ties of natural justice and equity' to make compensation for the benefits received." *Murdock–Bryant Const., Inc. v. Pearson*, 146 Ariz. 48, 53, 703 P.2d 1197, 1202 (1985). Particularly, "[w]hen the plaintiff has conferred a benefit upon the defendant in reliance upon an agreement that is unenforceable under the statute of frauds, the plaintiff is entitled to restitution of the benefit conferred to prevent unjust enrichment of the defendant at the plaintiff's expense." Dan B. Dobbs, *Law of Remedies* § 13.2(2) at 519 (2d ed.1993); see e.g. *Trollope v. Koerner*, 106 Ariz. 10, 470 P.2d 91 (1970).  At a minimum, Breus obtained a benefit from his multi-year relationship with Plaintiffs, wherein Plaintiffs advised him,

19596-19596-00001\LAR\MCS\3482152.2

JABURG|WILK
Attorneys at Law

1  counseled him, and disclosed volumes of confidential and proprietary business plans

2  and materials to him. In return, Breus attempted to dissuade Miller from using taglines

3  that incorporated "power and "when" while simultaneously and surreptitiously causing

4  or at least encouraging the use of those terms on his own book without conferring any

5  benefit back to Plaintiffs. This is the very definition of unjust enrichment.

6      F.  Defendants Are Not Entitled To Summary Judgment On The Claim For
7          Federal Trademark Infringement And Unfair Competition (Count Five)

8      It is well settled that to prove trademark infringement, a plaintiff has the burden

9  of proving it owns a valid, protectable trademark and that the defendant used a phrase or

10  term without the consent of the plaintiff in a manner that is likely to cause confusion

11  among ordinary consumers as to the source, sponsorship, affiliation or approval of the

12  goods. Ninth Circuit Manual of Model Civil Jury Instructions, 15.1, 15.6. The

13  application of this test leads to the inevitable conclusion that Breus infringed WEC's

14  trademarks. WEC owns thirteen registered trademarks that use the term "when,"

15  including POWER OF WHEN in connection with "personal growth and motivation

16  consulting services." Breus used POWER OF WHEN in connection with the marketing

17  and sale of books, sleep courses, and consulting services. Not only is Breus' trademark

18  nearly identical to one of WEC's trademarks, it is confusingly similar to several other

19  WHEN® trademarks and to WEC's family of marks.[2] Also, the fields of use are either

20  the same (both provide consulting services) or closely related (books are closely related

21  to consulting services).  (PSOF ¶ 61).

22

23

24  [2] A family of marks is defined as "a group of marks having a recognizable common
    characteristic, wherein the marks are composed and used in such a way that the public
25  associates not only the individual marks, but the common characteristic of the family,
    with the trademark owner." *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d
26  1460, 1462, 18 USPQ2d 1889, 1891 (Fed. Cir. 1991).

11

JABURG|WILK
Attorneys at Law

1    In an effort to avoid the near-certain finding of likelihood of confusion, Breus

2    cleverly argues that likelihood of confusion is not the test. Instead, he argues that

3    because one of his uses of "The Power of When" is the title of his non-fiction book,

4    First Amendment considerations dictate that the Court apply the *Rogers* test. *See* MSJ at

5    14. However, after comparing the cases on which Breus relies to the facts in this case, it

6    is evident that the *Rogers* test does not apply.  The *Rogers* test is designed and used to

7    "strike an appropriate balance between First Amendment interests in protecting <u>artistic</u>

8    <u>expression</u> and the Lanham Act's purposes to secure trademarks rights." *Gordon v.*

9    *Drape Creative, Inc.*, 909 F.3d 257, 264 (9th Cir. 2018) (emphasis added).  The cases

10   Breus relies on (*see* MSJ at 14-16) all regard artistically expressive and fictional works

11   or characters. *See Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002)

12   (music group used Mattel's Barbie character for an artistically expressive song); *E.S.S.*

13   *Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) (video

14   game maker used strip club's name in an artistically expressive, fictional video game);

15   *Brown v. Electronic Arts, Inc.*, 724 F.3d 1235, 1243 (9th Cir. 2013) (video game maker

16   used NFL player Jim Brown's likeness in a series of artistically expressive, fictional

17   football video games); *Twentieth Century Fox Television v. Empire Distribution, Inc.*,

18   875 F.3d 1192 (9th Cir. 2017) (television network used record label's name as the title

19   of an artistically expressive, fictional television program).

20       Unlike the above cases, Breus uses the infringing phrase to market consulting

21   services, sleep courses and sleep-related products in addition to books. Moreover, the

22   book is a non-fiction, self-help book that is not an artistically expressive, fictional work.

23   Rather, it is much more like a seminar or workshop in book form which Breus uses as a

24   marketing tool to promote and sell his numerous other products and services. (DSOF

25   ¶¶1-12; PSOF, ¶¶ 62-63). This is the equivalent of writing a book called Starbucks

26   while opening a coffee shop called Starbucks and arguing that both uses are protected

12

JABURG|WILK
Attorneys at Law

by the First Amendment. Breus's use of "The Power of When" is typical commercial speech and ordinary trademark use and does not contain the artistic expression found in the song, video games, or television show at issue in the cases Breus relies on.

In cases where a defendant's allegedly infringing use was found to be commercial speech or ordinary trademark use, courts have decidedly not applied the *Rogers* test.  *See, e.g., Facenda v. N.F.L. Films, Inc*., 542 F.3d 1007, 1017-18 (3d Cir. 2008) (because the court held that the "infomercial" like cable TV production at issue was "commercial speech rather than artistic expression," it declined to "reach the issue whether our court will adopt the *Rogers* test."); *Masters Software, Inc. v. Discovery Commc'ns, Inc.*, 725 F. Supp. 2d 1294, 1306 (W.D. Wash. 2010) (reasoning that First Amendment interests are not implicated when the alleged infringer "was expressing nothing more than what any user of a suggestive trademark expresses when branding its product, and the Lanham Act's limitations on such 'expressions' do not violate the First Amendment.") (granting plaintiff a preliminary injunction and rejecting defendant's contentions that under *Rogers*, its choice of "Cake Boss" as the title of its reality television program and related marked products was an expressive work entitled to more protection than the typical use of a trademark).

In short, Breus has not met his burden to show that he used POWER OF WHEN in an expressive work protected by the First Amendment and as such, summary judgment should be denied. *See Gordon,* 909 F.3d at 264 ("The *Rogers* test requires the defendant to make a threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment.").

Separately, even if the Court finds Breus's book to be an expressive work meriting application of the *Rogers* test, that test should not be applied to the non-book uses of the mark, including the website at thepowerofwhen.com which utilizes affiliate

19596-19596-00001\LAR\MCS\3482152.2

1  marketing for Breus to sell sleep courses and other sleep-related products. (PSOF ¶ 62-
2  63).

3  Breus will likely attempt to convince this Court that his consulting work, courses,
4  and affiliate revenue from product sales are subject to the *Rogers* test because they are
5  for the purposes of promoting the book. In *Twentieth Century Fox Television,* 875 F.3d
6  at 1197, the Court held that promotional activities that are *auxiliary* to the expressive
7  work are also subject to the *Rogers* test. But here, Breus uses the book to promote his
8  sleep courses and affiliate sleep-related products, not the other way around. (PSOF, ¶¶
9  62-63). At a minimum, there is a material question of fact as to whether the sleep course
10  and affiliate products are auxiliary to the expressive work.

11  Even if the Court applies the *Rogers* test to all of Breus's uses of POWER OF
12  WHEN, a genuine dispute of material fact still remains which precludes summary
13  judgment. *See Gordon*, 909 F.3d at 265 ("When … defendant moves for summary
14  judgment and has demonstrated that its use of the plaintiff's mark is part of an
15  expressive work, the burden shifts to the plaintiff to raise a genuine dispute as to at least
16  one of Rogers's two prongs."). Here, the remaining factual dispute regards prong two of
17  the *Rogers* test, *i.e.*, whether Breus's use of POWER OF WHEN "explicitly misleads as
18  to source or content."  *Id*. at 269.

19  Breus asserts that Plaintiffs cannot meet prong two merely because the book
20  doesn't mention Plaintiffs or explicitly misstate that Plaintiffs sponsored or endorsed it.
21  *See* MSJ at 15-16.  But explicit misstatements are not the only way prong two can be
22  met. "We … reject the district court's rigid requirement that, to be explicitly misleading,
23  the defendant must make an 'affirmative statement of the plaintiff's sponsorship or
24  endorsement.'" *Gordon*, 909 F.3d at 269. "In some instances, the use of a mark alone
25  may explicitly mislead consumers about a product's source if consumers would
26  ordinarily identify the source by the mark itself." *Id.* at 270.  This newer proclamation

14

JABURG|WILK
Attorneys at Law

1  by the Ninth Circuit is directly contrary to the language Breus quotes from older Ninth

2  Circuit cases. *See* MSJ at 15.

3      In this case, because of Miller and Breus's twenty-six month long personal and

4  business relationship during which Miller disclosed many details about Plaintiffs'

5  business, and based on Plaintiffs' use of the WHEN trademarks (including POWER OF

6  WHEN) as a core component of their business, including Miller writing and Breus

7  collaborating on Miller's own book *When, Vol. 1,* Plaintiffs customers, potential

8  customers, and potential investors were misled into believing that Breus and his book

9  were affiliated with, or part of Plaintiffs' business and services. (PSOF ¶ 64). As such,

10  Breus's use of the mark was sufficient to explicitly mislead these customers, potential

11  customers, and potential investors. Prong two of the *Rogers* test is therefore met and this

12  precludes summary judgment. *Gordon*, 909 F.3d at 265.

13

14      G.  <u>WEC Has Priority Because Breus Acquired No Trademark Rights In His Single Book Title and Used *The Power of When* in Bad Faith</u>

15      The parties agree that WEC filed its POWER OF WHEN trademark application

16  on August 28, 2016, establishing this is as WEC's nationwide priority date. *See* MSJ at

17  16. Even if everything Breus alleges regarding his use of *The Power of When* prior to

18  August 28, 2016 were true, WEC still has priority of use because Breus's own factual

19  contentions are that before August 28, 2016, Breus only used *The Power of When* as the

20  title of a single book. *See id.* It is well established that the title of a single book cannot

21  serve as a source identifier. *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156,

22  1162-63 (Fed. Cir. 2002) ("[T]he title of a single book cannot serve as a source

23  identifier" because "the publication of a single book cannot create, as a matter of law,

24  an association between the book's title (the alleged mark) and the source of the book

25  (the publisher)."); *Fierce, Inc. v. Franklin Covey Co.*, No. C18-1449-MJP, 2019 WL

26

JABURG|WILK
Attorneys at Law

1453573, at *6 (W.D. Wash. Apr. 2, 2019). As such, Breus loses the priority contest because he published any further books using *The Power of When* in the title. *See Herbko,* 308 F.3d at 1163 (where the book publisher did not provide evidence of a second book volume before the other party's  intent-to-use trademark application, the Federal Circuit ruled that the USPTO's Trademark Trial and Appeal Board "erred in holding" that the book publisher "established priority to the mark").

Breus also independently failed to acquire any trademark rights or priority in POWER OF WHEN because he used it in bad faith.  *Sleep Country USA, Inc. v. Nw. Pac., Inc.,* No. C02-1923P, 2003 WL 23842534, at *4 (W.D. Wash. Oct. 10, 2003) (citing *California Cedar Products v. Pine Mountain Corp*., 724 F.2d 827, 830 (9th Cir.1984). Bad-faith use of a trademark "does not establish priority of use." 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 16:10 (4th ed.2003). The evidence demonstrates that Miller shared the phrase POWER OF WHEN with Breus well before seeking trademark protections for it. *See* Section III(A), above. Despite knowing this Breus chose POWER OF WHEN as his book title. Such bad faith use independently defeats Breus's claim that "WEC lacks priority." MSJ at 16; *see Sleep Country USA*, 2003 WL 23842534, at *4.

**III.   Conclusion**

There are genuine issues of disputed facts that preclude summary judgment and the Motion should be denied.

JABURG|WILK
Attorneys at Law

1    DATED this 3rd day of May, 2019.

2                                    **Jaburg & Wilk, P.C.**

3

4

5                                    /s/*Maria Crimi Speth*
                                     Maria Crimi Speth
6                                    Laura Rogal
                                     Michael B. Dvoren
7                                    Aaron K. Haar
                                     3200 N. Central Avenue, 20th Floor
8                                    Phoenix, AZ 85012
                                     Attorneys for Plaintiffs/Counterdefendant
9

10

11                        CERTIFICATE OF SERVICE

12   I hereby certify that on the 3rd day of May, 2019, I electronically transmitted the
     attached document to the Clerk's Office using the CM/ECF System for filing, and for
     transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:
13
                              Sean Garrison
14                     Bacal & Garrison Law Group
                   6991 East Camelback Road, Suite D-102
15                         Scottsdale, AZ 85251
                      Sean.Garrison@bacalgroup.com
16            Attorneys for Defendants/Counterclaimants Breus

17

18                                   /s/*Giovanna Marinelli*

19

20

21

22

23

24

25

26
                                     17