**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IOW, LLC, an Arizona limited liability company; and When Enterprises Corp., a Delaware corporation, | No. CV18-1649-PHX-DGC |
| Plaintiffs/Counterdefendants, | **ORDER** |
| v. | |
| Michael Breus and Lauren Breus, husband and wife, | |
| Defendants/Counterclaimants. | |

Plaintiffs IOW, LLC ("IOW") and When Enterprises Corp. ("WEC") brought this action against Dr. Michael Breus and Lauren Breus, asserting claims for breach of contract and the implied covenant of good faith and fair dealing, misappropriation of trade secrets, unjust enrichment, unfair competition, and trademark infringement under 15 U.S.C. § 1114.  Doc. 1-1 at 1-19.  Defendants counterclaimed, seeking to cancel several of Plaintiffs' registered trademarks.[1]

Defendants move for summary judgment on all claims (Docs. 76, 79) and Plaintiffs cross-move on Defendants' counterclaim (Doc. 81).  The motions are fully briefed, and oral argument will not aid in the Court's decision.  *See* Fed R. Civ. P. 78(b).  For the

---

[1] Plaintiffs also asserted claims against Hachette Book Group, Inc. and Little, Brown, and Company (*id.* at 11-13), which were later dismissed with prejudice (Doc. 35).

following reasons, the Court will grant in part Defendants' motion as to Plaintiffs' claims and deny the parties' cross-motions on Defendants' counterclaims.

**I.    Background.**

Dr. Breus is a clinical psychologist, board certified in clinical psychology and sleep disorders, who studies how his patients' chronobiologies effect their treatment.  Docs. 77 at 1-2; 84 at 2.[2]  Chronobiology is the science of the human body's natural circadian rhythms, and a chronotype is an individual's internal circadian rhythm that influences her sleep cycle and activity.  Doc. 77 at 2.  Dr. Breus has authored three books and more than eighty blogs discussing chronobiology and circadian rhythms.  *Id.* at 2-3; Doc. 84 at 2.

In December 2013, Dr. Breus met Randy Miller, the sole member of IOW and the majority shareholder of WEC.  Docs. 77 at 7; 83 at 3.  Miller told Dr. Breus about his business, WHEN, and shared his ideas for an online counseling platform branded around the name, "If or When" or "If not Now When," where coaches would help customers achieve their goals based on the concept of: "If I don't do it now, when will I do it?"  Doc. 77 at 7.  Dr. Breus and IOW entered into a Confidentiality Agreement regarding their discussions in January 2014, but had no other agreements.  *Id.*  Dr. Breus provided no services to Plaintiffs and was never identified as an associate by their promotional materials.  *Id.*  In February 2015, IOW assigned the Agreement to WEC, which now owns all intellectual property related to the WHEN business.  *Id.* at 10.[3]

The present dispute concerns Dr. Breus's third book, The Power of When.  Dr. Breus and his ghostwriter, Valerie Frankel, began collaborating on the book in November 2014.  *Id.* at 3.  Originally titled The Overnight Solution, the book posits that an individual can be healthier and more productive by adjusting when she accomplishes certain tasks.  *Id.* at 3-4.  Based on extensive research, the book identifies four general chronotypes that inform when a person should do certain activities, and includes a "Bio-Time Quiz" that helps readers

---

[2] Citations are to page numbers attached to the top of pages by the Court's ECF system, not to original numbers on the document pages.

[3] The Confidentiality Agreement is dated January 10, 2013 on the first page, but the parties agree it was executed in 2014.  *See id.* at 7; Docs. 84 at 2; 84-9 at 2.

identify their chronotype.  *Id.*  In August 2015, Dr. Breus acquired the domain name thepowerofwhen.com to use as a promotional website for the book, which went live in August 2016.  *Id.* at 5.  He also registered thepowerofwhenquiz.com to publish his Bio-Time Quiz, which went live in July 2016.  *Id.*

The parties agree that Dr. Breus never disclosed information about Plaintiffs or Miller to his ghostwriter or publisher, Little, Brown, and Company ("LB").  *Id.* at 7.  But Plaintiffs assert that Dr. Breus, in developing the concept for his third book, used and incorporated information that he discussed with Miller and that was subject to the Confidentiality Agreement and trade secret protections.  *Id.*; Doc. 84 at 3.

## II. Summary Judgment Standard.

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome of the suit will preclude summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. Plaintiffs' Claims.

### A. Breach of Contract.

#### 1. IOW's Standing.

A plaintiff must establish that it has standing to bring suit.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  Three elements are required for Article III standing: (1) an

injury-in-fact, (2) causation between the injury and the allegedly wrongful conduct, and (3) that the injury is likely to be redressed by a favorable decision from the Court. *Lujan*, 504 U.S. at 560.

Plaintiffs allege that Defendants breached the January 2014 Agreement by using confidential business strategies and concepts in developing and marketing The Power of When. Doc. 1-1 at 8. Defendants argue that IOW lacks standing because it assigned the Agreement to WEC in February 2015, before Dr. Breus titled or published his book, and that IOW has no injury because WEC now owns all alleged intellectual property of the business. Doc. 76 at 17. IOW responds that it was under common control with WEC during the relevant time and therefore constitutes an "affiliate" under the Agreement and can enforce the confidentiality obligations. Docs. 83 at 5; *see* 84-9 at 2-3.

The Agreement deems confidential certain information disclosed by the "Owner" to the "Recipient. *See* Doc. 84-9 at 2-3. The terms Owner and Recipient are defined to include "affiliates of the parties," meaning "any person or entity controlling, controlled by[,] or under common control with a party." *Id.* Defendants do not dispute that IOW is an "affiliate" under the Agreement and was under common control with WEC at the time of the alleged breach. They assert instead that IOW must be a primary party in interest to enforce the Agreement's terms, citing *Stratton v. Inspiration Consolidated Copper Co.*, 683 P.2d 327 (Ariz. Ct. App. 1984), which states that to "recover under the third party beneficiary doctrine, the contract relied upon by the third party must reflect that the parties thereto intended to recognize [it] as a primary party in interest." Doc. 91 at 2.

IOW does not argue that it is a third-party beneficiary or that it qualifies to sue for breach of the Agreement as a third-party beneficiary. Nor does it address specifically how it otherwise satisfies the elements required for Article III standing. IOW states that "the rights and obligations under the [Agreement] extend to affiliates of the parties under common control," that it "continued to be covered under the terms of the [Agreement]," and that it owned the proprietary information when Defendants first began breaching. Doc. 83 at 5-6. The broad definitions of Owner and Recipient to include "affiliates" appear

- 4 -

to expand the scope of information deemed confidential. But saying that an affiliate's information is to be treated as confidential under the Agreement is not the same as saying that the affiliate is a party to the Agreement with rights to sue for breach. And other than the Agreement language, IOW cites no evidence in the record showing when it was injured, what cognizable injury it suffered as a non-party "affiliate," or any legal authority supporting its standing argument. IOW has failed to establish standing to assert the breach of contract claim, and the Court will grant Defendants summary judgment against IOW on this claim. *See Celotex*, 477 U.S. at 322; *Lujan*, 504 U.S. at 560-61.

### 2. WEC's Claim.

To prevail on a breach of contract claim, a plaintiff must show the existence of a contract, its breach, and resulting damages. *See Thomas v. Montelucia Villas, LLC*, 302 P.3d 617, 621 (Ariz. 2013); *Snow v. W. Sav. & Loan Ass'n*, 730 P.2d 204, 210 (Ariz. 1986). "[I]nterpretation of a contract is generally a matter of law," *Powell v. Washburn*, 125 P.3d 373, 375 (Ariz. 2006), but whether a party has breached the contract is a question for the trier of fact, *see Walter v. F.J. Simmons*, 818 P.2d 214, 218-19 (Ariz. Ct. App. 1991); *Shiloh Custom Homes, Inc. v. Drywall*, No. 1 CA-CV 07-0677, 2009 WL 690600, at *7 (Ariz. Ct. App. Mar. 17, 2009). A party breaches a contract when it "fail[s], without legal excuse, to perform any promise which forms the whole or part of a contract." *Snow*, 730 P.2d at 210.

WEC alleges that Defendants breached the Agreement by using confidential business strategies and concepts to their advantage (Doc. 1-1 at 8), including WEC's trademarks, branding, and business models (Doc. 83 at 6-8). Defendants argue that WEC has no evidence that Dr. Breus shared WEC's confidential information with others to show breach. Doc. 76 at 8-10.

WEC asserts that Dr. Breus "utilize[d] the confidential materials received from [WEC], which included the confidential proposed trademarks and branding of WHEN selected by Mr. Miller." Doc. 83 at 6. But WEC's unexplained record citations do not support this assertion. They reference Defendants' statement of facts regarding Dr. Breus's collaboration with Frankel, Defendants' characterization of The Power of When book, and

Defendants' disputed contention that Dr. Breus acquired the domain names at LB's instruction.  *Id.* (citing Doc. 77 at 3, 5).  WEC also cites its statement of facts, which identifies the date on which Dr. Breus released the book, quotes the book's synopsis and selected content, and quotes part of the book's forward, written by Dr. Mehmet Oz.  *Id.* (citing Doc. 84 at 7-8).  WEC then discusses how, before Miller met Dr. Breus, Miller requested his attorney perform a trademark search on Power of When, and that he and his attorney "considered that phrase to be highly confidential" until it was publicly disclosed in an August 2016 trademark application.  *Id.*  But this evidence does not show that Defendants disclosed confidential information in violation of the Agreement.[4]

WEC contends that The Power of When and the book's marketing materials and programs mimic the WHEN programs, ideas, and brand models.  Doc. 83 at 6-7.  But WEC's cited evidence again fails to support these assertions.  WEC cites its statement of facts, which reasserts that the Agreement covered financial and business-related information related to the WHEN business, including the phrase, "the power of when," again discusses when Dr. Breus released his book, and quotes parts of the book's content, synopsis, and forward.  *Id.* (citing Doc. 84 at 6-8).  Defendants do not dispute that Miller shared with Dr. Breus many of the things WEC alleges (*see* Doc. 91 at 3 n.1), but WEC's citations do not show that Dr. Breus ever disclosed that information to others in violation of the Agreement.  The evidence simply describes information purportedly covered by the Agreement, and quotes portions of The Power of When.

WEC argues next that the origin of Dr. Breus's book title is disputed and creates an issue of fact regarding breach.  Doc. 83 at 7.  Defendants cite evidence that Dr. Breus's publisher, LB, conceived the title in a meeting where Dr. Breus was not present and later suggested the title to him via email.  Doc. 76 at 9-10 (citing Doc. 77-2 at 8-13).  WEC responds with the following evidence.  Doc. 83 at 7.  In a series of emails between Dr. Breus, Frankel, Dr. Breus's agent, Alex Glass, and Tracy Behar of LB, Behar stated that

---

[4] Indeed, Dr. Breus told Miller he intended to title his book The Power of When in December 2015.  Prior to filing his trademark application on August 28, 2016, Miller never told Dr. Breus not to use the title.  *See* Doc. 77-3 at 60.

Glass and she had discussed Perfect Timing, When to Do Everything, and Time of Your Life as title options, and that Frankel liked The Science of When.  *See* Doc. 84-14 at 2-3. Glass responded that he liked The Science of When and that Dr. Breus liked Perfect Timing and Time of Your Life.  Behar suggested The Power of When several days later.  *Id.*  Based solely on these communications, WEC contends that "serious question[s] of credibility" preclude summary judgment because Glass and Dr. Breus discussed title options before Behar suggested The Power of When and Frankel had also previously suggested a similar title.  Doc. 83 at 7.[5]

These emails are the sole basis for WEC controverting Behar's sworn testimony that she and LB conceived the title without input from Dr. Breus.  *See* Docs. 77 at 5; 84 at 3. The email discussion involves no communication by Dr. Breus, and Glass stated specifically that Dr. Breus's title suggestions were Perfect Timing and Time of Your Life. *See* Doc. 84-6 at 2.  Behar testified about how the title was suggested.  She testified that she immediately disliked the book's working title, The Overnight Solution, and described the common title-change process that the publisher engaged in of emailing and meeting to brainstorm alternatives.  Doc. 77-2 at 8-13.  She testified that The Power of When title was developed in a meeting involving only the publisher, marketing director, managing editor, and paperback publisher.  *Id.* at 15.  She explained that Frankel came up with The Science of When, but the publisher found the word "science" too technical-sounding so she suggested "power," which Behar then suggested via email to Dr. Breus, Frankel, and Glass.

This evidence clearly contradicts WEC's assertion that the book title came from Dr. Breus's violation of the Agreement, and WEC presents no contrary evidence.  WEC's argument that credibility issues preclude summary judgment is likewise not supported by any evidence undercutting the truthfulness of the email exchange or the participants'

---

[5] WEC cites Glass's email statement that he received "a text from [Dr. Breus] with some thoughts," and argues that Dr. Breus's subsequent deletion of those texts has precluded WEC from knowing whether Dr. Breus suggested The Power of When as a title. Doc. 83 at 4 n.1.  WEC develops no spoliation argument, and otherwise cites no evidence that the deleted messages pertain to book title suggestions.  Without more evidence or explanation, the absence of text messages is insufficient to create a dispute of material fact.

testimony about it.  "[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment."  *Sudre v. The Port of Seattle*, NO. C15-0928JLR, 2016 WL 7035062, at *7 (W.D. Wash. Dec. 2, 2016) (quoting *Nelson v. Pima Cmty. Coll.*, 83 F. 3d 1075, 1081-82 (9th Cir. 1996)); *see also Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 59 (1st Cir. 2011) ("theoretical possibilities alone are inadequate to block the swing of the summary judgment ax").  And the Court has no obligation to search the record for evidence creating a dispute of fact that WEC fails to identify.  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996); *see also Independent Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003).

WEC argues that even if Dr. Breus did not suggest The Power of When as a book title, he had a duty under the Agreement not to use it.  Alternatively, WEC argues that a dispute of fact exists regarding whether the Agreement created such a duty.  Doc. 83 at 8. WEC cites two paragraphs of its statement of facts in support of this assertion, but the citations refer to 41 pages of the record and cite no specific pages.  Such a general reference fails to identify evidence "so that it could conveniently be found."  *Carmen*, 237 F.3d at 1031.  In any event, Dr. Breus's duties under the Agreement are questions of law, not fact. WEC fails clearly to explain why, in the absence of evidence that Dr. Breus disclosed confidential information, summary judgment is inappropriate.  WEC has failed to present evidence showing breach, an essential element on which it would bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  The Court will grant Defendants summary judgment on the breach of contract claim.

**B.      Breach of the Implied Covenant of Good Faith and Fair Dealing.**

Under Arizona law, every contract "implies a covenant of good faith and fair dealing."  *Rawlings v. Apodaca*, 726 P.2d 565, 569 (Ariz. 1986).  The implied covenant "prohibits a party from doing anything to prevent other parties to the contract from receiving the benefits and entitlements of the agreement.  The duty arises by operation of law but exists by virtue of a contractual relationship."  *Wells Fargo Bank v. Ariz. Laborers*,

1    38 P.3d 12, 29 (Ariz. 2002).  "A party may breach the implied covenant even in the absence

2    of a breach of an express provision of the contract by denying the other party the reasonably

3    expected benefits of the agreement."  *Nolan v. Starlight Pines Homeowners Ass'n*, 216

4    Ariz. 482, 489 (Ariz. Ct. App. 2007).

5         Plaintiffs allege that Dr. Breus breached the Agreement's implied covenant of good

6    faith and fair dealing by developing, marketing, and selling confidential material covered

7    by the Agreement, and engaging in self-dealing in bad faith to advance his interests to

8    Plaintiffs' detriment.  Doc. 1-1 at 9.

9         Defendants argue that IOW lacks standing because it assigned the Agreement to

10   WEC before the titling and publication of Dr. Breus's book, meaning that IOW had no

11   contractual relationship with Dr. Breus at the time of the alleged injury.  Doc. 76 at 17.

12   IOW does not meaningfully respond.  *See* Doc. 83 at 5-6.  As with its breach of contract

13   claim, IOW fails to explain why it has standing to raise a breach of implied covenant claim

14   without a contractual relationship with Dr. Breus.  *Id.*  Nor does IOW cite any evidence of

15   an injury it suffered while still a party to the Agreement.  *See id.*  IOW asserts that Dr.

16   Breus interfered with its rights under the Agreement, but cites only a sentence of its

17   statement of facts which refers to 67 pages of the record and includes no specific page

18   citation.  *See id.* (citing Doc. 84 at 6).  IOW's general and unsupported assertions are

19   insufficient to establish standing, as well as elements of its claim – namely that Dr. Breus

20   prevented IOW, as a party to the contract, from receiving the Agreement's benefits.  *See*

21   *Celotex*, 477 U.S. at 322; *Carmen*, 237 F.3d at 1031; *Wells Fargo*, 38 P.3d at 29.[6]

22        Defendants argue that WEC's claim fails for lack of evidence that Dr. Breus

23   breached the Agreement or used any material that he learned from Miller.  Doc. 76 at 10.

24   WEC asserts that even if Dr. Breus did not breach the Agreement, his actions interfered

25   with its rights under the Agreement and he competed directly with WEC while "supposedly

---

27        [6] Defendants assert that IOW lacks standing to raise all claims (*see* Docs. 76 at 17,
28   91 at 2), but their arguments focus only on IOW's contract-based allegations.  They present
     no other claim-specific arguments.  The Court will not address general arguments that
     Defendants' summary judgment motion fails to explain.  *See Celotex*, 477 U.S. at 323.

1    collaborating with Plaintiffs under the [Agreement]."  Doc. 83 at 9.  Other than a general

2    citation to two exhibits totaling 67 pages, WEC cites no supporting evidence in the record

3    for these assertions.  WEC states that Miller repeatedly told Dr. Breus to "hold all business

4    activities close to the vest," but fails entirely to cite evidence showing that Dr. Breus

5    breached or interfered with the Agreement.  Again, the Court will not search the record for

6    evidence to support WEC's arguments.  *See Carmen*, 237 F.3d at 1031; *Keenan*, 91 F.3d

7    at 1279; *Independent Towers*, 350 F.3d at 929.

8        Indeed, Defendants' cited evidence shows that Miller repeatedly testified that

9    numerous aspects of Dr. Breus's book appeared nowhere in WHEN programs or materials,

10   including chronobiology, chronotypes, and instructing people on when to perform certain

11   tasks.  *See* Doc. 77-3 at 8, 12, 17, 19-20, 22-23, 26, 28-33, 40-42.  Miller also testified that

12   numerous aspects of the WHEN business did not appear in the book, including online

13   counseling services, membership and service levels, and WHEN's gratitude tool.  *Id.* at

14   35-36, 38-39.  When asked specifically what confidential information was disclosed in The

15   Power of When, Miller answered: "I think we've covered that it's not confidential

16   information.  It's more of a misappropriation of use of 'WHEN,' 'Power of WHEN,' and

17   other uses of 'WHEN' throughout the book."  *Id.* at 43.  Miller admitted that his business's

18   use of the word "when" was not confidential.  *Id.* at 47-46.  And the Agreement excludes

19   from confidentiality any information that is or becomes publicly available through no

20   wrongful act of the Recipient or which is disclosed to the Recipient by a third party.  *See*

21   Doc. 84-9 at 2.  The Court will grant summary judgment for Defendants on Plaintiffs'

22   breach of the implied covenant of good faith and fair dealing claim.

23       **C.**    **Misappropriation of Trade Secrets.**

24           **1.**    **Arizona Law.**

25       "To establish a claim for misappropriation of a trade secret, the claimant must first

26   prove a legally protectable trade secret exists.  Arizona has adopted the Uniform Trade

27   Secrets Act ('UTSA'), which codifies the basic principles of common law trade secret

28

protection." *Calisi v. Unified Fin. Servs., LLC*, 302 P.3d 628, 631 (Ariz. Ct. App. 2013).
The UTSA states:

> "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process that both:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain secrecy.

A.R.S. § 44-401(4)(a)-(b).  "Because the hallmark of a trade secret is secrecy, the two-part inquiry under the UTSA focuses on: first, whether the subject matter of the information is secret; and second, whether reasonable efforts have been taken to keep the information secret." *Calisi*, 302 P.3d at 631.  "[A] trade secret is not simply information as to single or ephemeral business events.  Rather, a trade secret may consist of a compilation of information that is continuously used or has the potential to be used in one's business and that gives one an opportunity to obtain an advantage over competitors who do not know of or use it." *Cosmetic Alchemy, LLC v. R & G, LLC*, No. CV-10-1222-PHX-GMS, 2010 WL 4777553, at *4 (D. Ariz. Nov. 17, 2010) (quoting *Enter. Leasing Co. of Phx. v. Ehmke*, 3 P.3d 1064, 1068 (Ariz. Ct. App. 1999)).

A plaintiff must also show an "actual or threatened misappropriation." *TDCCS LLC v. Ethical Prods. Inc.*, No. CV-19-01312-PHX-SMB, 2019 WL 1242961, at *3 (D. Ariz. Mar. 18, 2019) (citing *Calisi*, 302 P.3d at 631-32).  "Misappropriation involves the unfair taking for profit, at little or no cost, of property acquired by another through investment of substantial time and money." *Spindle, Inc. v. Clark*, CIV 16-2613-PHX-MHB, 2017 WL 10635897, at *17 (D. Ariz. Feb. 22, 2017).

### 2.   Discussion.

Plaintiffs assert that that their misappropriated trade secret consists collectively of the physical materials provided to Dr. Breus, the general structure of the WHEN business, and Miller's proposed trademarks to be used with the business.  Doc. 83 at 9-10.

Defendants assert that Plaintiffs identify no cognizable trade secret because they fail to identify secret or protected elements of the WHEN system, and trademarks, by definition, cannot be secret.  Doc. 76 at 10-11.

Under the UTSA, Plaintiff must show that the identified subject matter was secret and that they took reasonable efforts to keep it secret.  *See Calisi*, 302 P.3d at 631; A.R.S. § 44-401(4).  Plaintiffs assert that since Miller's relationship with Dr. Breus began, they have "made clear that the majority of their business information, including the general business model, the specific WHEN programming, training manuals, and proposed trademarks were all trade secrets."  Doc. 83 at 9-10.  Plaintiffs cite generally three paragraphs of their statement of facts, which refer to 67 pages of the record with no specific page citations.  *Id.* at 10 (citing Doc. 84 at 6).  Plaintiffs do not show that the identified information was secret, nor do they explain how they took reasonable efforts to keep it secret.  The Court will not search for supporting evidence where it "is not set forth in the opposing papers with adequate references so that it [can] conveniently be found."  *Carmen*, 237 F.3d at 1031; *see also Keenan*, 91 F.3d at 1279.

Referring to a 41-page exhibit with no specific page citations or explanation, Plaintiffs assert that while they were creating their "revolutionary" business model, "no one else was doing what they were proposing," and the program would "upend the self-help marketplace once it was launched."  Doc. 83 at 10.  These unsupported assertions fail to show that Plaintiffs' programs and business model "derive[d] independent economic value . . . from not being generally known to, and not being readily ascertainable" by others.  A.R.S. § 44-401(4); *see Calisi*, 302 P.3d at 631.  Nor do they show that Plaintiffs "made reasonable efforts to maintain the secrecy of the information [allegedly] transferred."  *Cosmetic Alchemy*, 2010 WL 4777553, at *5.

Defendants cite Miller's testimony that the trade secret disclosed in Dr. Breus's book is "WHEN" and "Power of WHEN," that he did not own the trademark Power of WHEN until August 2016 when he filed a public trademark application, that the information disclosed in Dr. Breus's book was "not confidential information," and that it

was no secret that he used "when" in connection with his business. Docs. 76 at 10-12; 77-3 at 42-43, 47, 60. Plaintiffs fail to meaningfully engage Defendants' arguments and evidence, or to cite specific portions of the record showing that the identified information was secret and that they took "such precautions as are reasonable under the circumstances to preserve the secrecy of the information." *Joshua David Mellberg LLC v. Will*, 96 F. Supp. 3d 953, 974 (D. Ariz. 2015).[7]

Defendants also argue that no evidence of misappropriation exists. Doc. 76 at 12-13. They assert that Dr. Breus's book was the product of extensive research and includes hundred of citations to published articles and other materials, none involving Plaintiffs or Miller. *Id.* at 12. They note that Miller testified that he had no reason to believe Dr. Breus did not use those identified sources in researching and writing the book. Doc. 77-3 at 44. Plaintiffs do not address this argument or cite any evidence of misappropriation. *See* Doc. 83 at 9-10.

Because Plaintiffs fail to establish the elements of their trade secrets misappropriation claim, the Court will grant summary judgment in favor of Defendants. *See Celotex*, 477 U.S. at 322.

**D.   Unjust Enrichment.**

A party is unjustly enriched when it "has and retains money or benefits which in justice and equity belong to another." *City of Sierra Vista v. Cochise Enters., Inc.*, 697 P.2d 1125, 1131 (Ariz. Ct. App. 1984). The elements of unjust enrichment are "(1) an enrichment; (2) an impoverishment; (3) a connection between the enrichment and the impoverishment; (4) absence of justification for the enrichment and the impoverishment, and (5) an absence of a remedy provided by law." *Id.*; *see also Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011).

---

[7] Plaintiffs cite a page of testimony by a trademark attorney, which they mischaracterize as showing that "proposed trademarks are trade secrets until they are made public." Doc. 83 at 10. The lawyer's testimony was simply that he advises his clients who are interested in filing a trademark application to not disclose information about their application to others for various reasons. *See* Doc. 84-11 at 3-4. The testimony does not address Plaintiffs' purported trade secrets, and Plaintiffs cite no authority showing that proposed trademarks are per se trade secrets until made public.

1
2
3
4
5
6
7
8
9
10

Plaintiffs allege unjust enrichment based on Defendants' receipt of trade secret information and business materials. Doc. 101 at 10. Defendants argue that Plaintiffs' claim fails because they have no evidence of misappropriation that would constitute an impoverishment. Doc. 76 at 13. Plaintiffs do not meaningfully respond. They discuss some legal authority regarding unjust enrichment and assert that Dr. Breus benefitted from his relationship with Plaintiffs, where they "disclosed volumes of confidential and proprietary business plans and materials to him" without compensation. Doc. 83 at 11-12. But they fail to address Defendants' argument and provide no citation to the record supporting any elements of their unjust enrichment claim. The Court will grant summary judgment on this claim. *See Celotex*, 477 U.S. at 322.

11

    **E.**    **Unfair Competition and Infringement under the Lanham Act.**

12

        **1.**    **Priority.**

13
14
15
16
17
18
19
20
21
22

"A party claiming trademark ownership must establish that it was the first to use the mark in the sale of goods or services. This concept is known as trademark 'priority.'" *Hana Fin., Inc. v. Hana Bank*, 735 F.3d 1158, 1160 (9th Cir. 2013). "To determine whether a party has established proprietary rights in a mark, the Ninth Circuit instructs courts to consider the 'totality of the circumstances.'" *Seal Shield, LLC v. Otter Prods., LLC*, NO. 13-cv-2736-CAB, 2014 WL 11350295, at *3 (S.D. Cal. Nov. 4, 2014) (quoting *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1052 (9th Cir. 1999)); *see also Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1158 (9th Cir. 2001). Under this test, district courts "should be guided in their consideration of [a trademark owner's] non-sales activities" with the following factors:

23
24
25
26
27
28

> the genuineness and commercial character of the activity, the determination of whether the mark was sufficiently public to identify or distinguish the marked service in an appropriate segment of the public mind as those of the holder of the mark, the scope of the non-sales activity relative to what would be a commercially reasonable attempt to market the service, the degree of ongoing activity of the holder to conduct the business using the mark, the amount of business transacted, and other similar factors which might distinguish whether a service has actually been "rendered in commerce."

*Chance*, 242 F.3d at 1159; *see also Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1204-06 (9th Cir. 2012) (discussing and applying *Chance* factors).   While "trademark rights are not conveyed through mere intent to use a mark commercially," they "can vest even before any goods or services are actually sold if 'the totality of [one's] prior actions, taken together, [can] establish a right to use the trademark.'"   *Chance*, 242 F.3d at 1158-59; *see also* 2 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 16:11 (5th ed. 2019) ("Rights in a trademark are gained through use before the relevant public in the marketplace, not through invention.").

To the extent Plaintiffs' claim is based on WEC's Power of When trademark, Defendants argue that they are entitled to judgment because WEC lacks priority.   Doc. 76 at 16.   In support, Defendants cite the following evidence:   Dr. Breus told Miller the title of his book in December 2015, and the title was conceived, domain names acquired, websites published, promotions began, and more than 15,000 copies of the book were shipped to retailers, all before WEC filed its trademark intent-to-use application on August 28, 2016.   *Id.* at 16-17.

Plaintiffs dispute none of this evidence.   Doc. 83 at 16-17.   Nor do they cite evidence that they used the mark before August 2016.   Plaintiffs instead argue that Dr. Breus's titling of the book cannot establish priority, citing two cases which state that "the title of a single book cannot serve as a source identifier" and that "the publication of a single book cannot create, as a matter of law, an association between the book's title (the alleged mark) and the source of the book."   *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 1162-63 (Fed. Cir. 2002); *see also Fierce, Inc. v. Franklin Covey Co.*, NO. C18-1449-MJP, 2019 WL 1453573, at *6 (W.D. Wash. Apr. 2, 2019) (citing *Herbko*).   Plaintiffs cite no Ninth Circuit case adopting this per se rule, and the Ninth Circuit has recognized that its totality of the circumstances approach to determining priority is "more flexible than the approaches taken by other courts."   *Chance*, 242 F.3d at 1159.   In any event, Defendants' cited evidence includes more than the book's title – it includes several promotional activities and the shipping of 15,000 books to retailers.   *See* Doc. 91 at 12.

1
2
3
4
5
6
7
8
9
10
11
12

The Court cannot, however, conclude as a matter of law that Defendants' identified activities preclude Plaintiffs from establishing priority.  Defendants engaged in several activities before Plaintiffs filed their intent to use application, including publishing promotional websites for The Power of When and shipping thousands of copies to retailers. But Plaintiffs' application constitutes "prima facie evidence of the validity of the registered mark," *see* 15 U.S.C. §§ 1057, 1115, and the Court must view the evidence in favor of the non-moving Plaintiffs, *see Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1115 (9th Cir. 2010) ("the presumption of [registration] validity is a strong one, and the burden on the defendant necessary to overcome that presumption at summary judgment is heavy").  The totality of the circumstances analysis "implicat[es] a highly fact-specific" inquiry, which in this case, the Court concludes, is more appropriately reserved for the factfinder at trial.  *See Rearden*, 683 F.3d at 1208.

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Considering the Ninth Circuit's factors and viewing the evidence in Plaintiffs' favor, the Court finds that an issue of fact exists regarding whether Defendants' pre-August 2016 activities rebut Plaintiffs' presumption of ownership.  *See Brookfield*, 174 F.3d at 1052; *see also Chance*, 242 F.3d at 1158-59; *Dep't of Parks & Recreation for State of Cal. v. Bazaar del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006) (prima facie evidence of ownership under 15 U.S.C. §§ 1057(b) and 1115(a) is rebuttable presumption).  As noted above, the Ninth Circuit's factors are used to decide whether a service using the mark has actually been "rendered in commerce," and includes an inquiry into "whether the mark was sufficiently public to identify or distinguish the marked service in an appropriate segment of the public mind as those of the holder of the mark[.]"  *Chance*, 242 F.3d at 1159.  A reasonable jury could weigh the factors and determine that Defendants' pre-registration activities – most of which appear to have occurred out of the public eye – were not sufficiently public to identify the mark in an appropriate segment of the public mind as Defendants' mark.  The Court cannot grant Defendants' motion on this basis.  *See Anderson*, 477 U.S. at 248.[8]

28

---

[8]  Plaintiffs argue that Defendants failed to acquire trademark rights before August

2.      **The Lanham Act and the *Rogers* Test.**

"The Lanham Act provides a cause of action for the owner of a registered trademark against any person who, without consent of the owner, uses the trademark in commerce in connection with the sale or advertising of goods or services, when such use is likely to cause confusion." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 932 (9th Cir. 2017) (citing 15 U.S.C. § 1114(1)).  To prevail on unfair competition and trademark infringement claims, a plaintiff must prove that it had a valid trademark and the defendant used a similar mark in commerce that is likely to cause confusion as to the source, affiliation, connection, or association of the defendant's goods or services.  *3 Ratones Ciegos v. Mucha Lucha Libre Taco Shop 1 LLC*, No. CV-16-04538-PHX-DGC, 2017 WL 4284570, at *2 (D. Ariz. Sept. 27, 2017) (citing *Eclipse Assocs. Ltd. v. Data Gen. Corp.*, 894 F.2d 1114, 1118 (9th Cir. 1990)).  "In general, claims of trademark infringement under the Lanham Act are governed by a likelihood-of-confusion test." *Twentieth Century Fox Television v. Empire Distrib., Inc.*, 875 F.3d 1192, 1196 (9th Cir. 2017); *see also FLP LLC v. Wolf*, No. CV-17-00214-PHX-DGC, 2018 WL 3586402, at *2 (D. Ariz. July 26, 2018) (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979)).

"When the allegedly infringing use is in the title of an expressive work, however, [the Ninth Circuit] instead appl[ies] a test developed by the Second Circuit in *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989), to determine whether the Lanham Act applies." *Empire*, 875 F.3d at 1196 (citing *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 900 (9th Cir. 2002)).  Under *Rogers*, a defendant must first "make a threshold legal showing that its allegedly infringing use is part of an expressive work protected by the First Amendment." *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 264 (9th Cir. 2018).  If the defendant makes this showing, "then the plaintiff claiming trademark infringement bears a heightened burden." *Id.*  The plaintiff must satisfy the likelihood-of-confusion test, and must also

---

2016 because Dr. Breus's choice to use The Power of When as a title was made in bad faith after Miller shared the phrase.  Doc. 83 at 16-17.  The Court need not address this argument because, as discussed above, Plaintiffs have cited no evidence that Dr. Breus was involved in the decision to title his book.  Thus, even if bad faith precludes acquiring trademark rights, Plaintiffs have shown none.

show that "the defendant's use of the mark (1) is not artistically relevant to the work or (2) explicitly misleads consumers as to the source or the content of the work." *Id.* at 264-65. The *Rogers* test "strike[s] an appropriate balance between First Amendment interests in protecting artistic expression and the Lanham Act's purposes to secure trademarks rights[,]" ensuring that "[t]he owner of a trademark 'does not have the right to control public discourse' by enforcing his mark." *Id.* at 264.

### 3. Whether *Rogers* Applies.

Plaintiffs allege that they own various trademarks related to personal growth and motivation consulting services, and that Defendants' publication and marketing of Dr. Breus's book are likely to cause confusion related to their marks and therefore constitute infringement and unfair competition under 15 U.S.C. §§ 1114, 1125(a). Doc. 1-1 at 11-12. Defendants assert that their publication and promotion of The Power of When are protected under the First Amendment, and that Plaintiffs cannot satisfy either *Rogers* prong. Doc. 76 at 14-16. As noted, Defendants bear the initial burden of showing that the allegedly infringing use "is part of an expressive work protected by the First Amendment." *See Gordon*, 909 F.3d at 264; *see also Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1241 (9th Cir. 2013) ("The *Rogers* test is reserved for expressive works."). Only if Defendants make such a showing must Plaintiffs satisfy the likelihood-of-confusion test and one of the two *Rogers* prongs to survive summary judgment. *See Gordon*, 909 F.3d at 264-65.

Defendants assert that the "title The Power of When, as well as the use of the word 'when' in the book contents and promotional efforts, is protected by the First Amendment," citing the Second Circuit's statement in *Rogers* that "[m]ovies, plays, books, and songs are all indisputably works of artistic expression and deserve protection." Doc. 76 at 14; *see Rogers*, 875 F.2d at 997. Plaintiffs argue that Defendants fail to make their "threshold legal showing" that the First Amendment applies, asserting that Defendants' allegedly infringing use is commercial speech and ordinary trademark use, and that *Rogers* does not apply to a non-fiction self-help book that is not artistically expressive. Doc. 83 at 13-14.

The Ninth Circuit has stated repeatedly that the *Rogers* test was adopted "to strike an appropriate balance between First Amendment interests in protecting *artistic* expression and the Lanham Act's purposes to secure trademark rights." *Gordon*, 909 F.3d at 264 (emphasis added); *E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1099 (9th Cir. 2008) ("[*Rogers*] requires courts to construe the Lanham Act to apply to *artistic works* only where the public interest in avoiding consumer confusion outweighs the public interest in free expression.") (internal quotations omitted, emphasis added); *Walking Mountain Prods.*, 353 F.3d at 807 ("we adopted the Second Circuit's First Amendment balancing test for applying the Lanham Act to titles of *artistic works* as set forth in *Rogers*") (emphasis added); *In re NCAA Student-Athlete Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1280 (9th Cir. 2013) ("We first endorsed the *Rogers* test for Lanham Act claims involving *artistic or expressive works* . . . . [but] we extended the *Rogers* test slightly, noting that '[a]lthough this test traditionally applies to uses of a trademark in the *title* of an *artistic work*, there is no principled reason why it ought not also apply to the use of a trademark in the body of the work.'") (emphasis added).

Indeed, the *Rogers* test itself considers whether an allegedly infringing title has *artistic* relevance. *See Rogers*, 875 F.2d at 999. And the three cases where the Court of Appeals has applied *Rogers* to expressive titles all involved obviously creative or artistic works: the song title "Barbie Girl," the title of a photography series called "Food Chain Barbie," showing Barbie dolls and parts in strange positions, and the title of a fictional television show, "Empire." *Gordon*, 909 F.3d at 266-67 (citing and discussing *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002); *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003); *Twentieth Century Fox*, 875 F.3d at 1192). Defendants cite no Ninth Circuit case applying *Rogers* to the title of a non-fiction book. *See* Docs. 76 at 14; 91 at 8-9.

The Ninth Circuit has also recognized that "when marks 'transcend their identifying purpose' and 'enter public discourse and become an integral part of our vocabulary,' they 'assume a role outside the bounds of trademark law.'" *Walking Mountain Prods.*, 353 F.3d

at 807 (quoting *MCA Records*, 296 F.3d at 900).  The court has instructed that it is where a mark "assumes such cultural significance [that] First Amendment protections come into play," *id.*, because "the trademark owner does not have the right to control public discourse whenever the public *imbues his mark* with *a meaning beyond its source-identifying function*."  *MCA Records*, 296 F.3d at 900; *see also Gordon*, 909 F.3d at 268 (describing a party's threshold showing as demonstrating that a work "evinces an intent to convey a particularized message, and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it," referring to whether a work "represented a tangible expression of an idea").

Some district courts have similarly found that *Rogers* applies only where trademarks "have entered the cultural lexicon" or "have cultural significance."  *See Rebelution, LLC v. Perez*, 732 F. Supp. 2d 883, 887-88 (N.D. Cal. 2010) (citing *Walking Mountain Prods.* and *MCA Records*); *see also Hush Hush Sound, Inc. v. H&M Hennes & Mauritz LP*, Case No. 2:17-cv-07668-RGK-SS, 2018 WL 4962086, at *3 (C.D. Cal. Jan. 26, 2018) ("The *Rogers* test applies only to artistic or expressive works; it is not applicable to commercial works such as a traditional advertisement.") (citing *Brown*, 724 F.3d at 1241; 6 J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 31:144.50 (5th ed. 2017)); *Warner Bros. Entm't v. Global Asylum, Inc.*, No. CV 12-9547 PSG (CWx), 2012 WL 6951315, at *15-16 (C.D. Cal. Dec. 10, 2012) (discussing cases).

The Court must determine therefore whether Plaintiffs' mark, Power of When, has assumed cultural significance or meaning beyond its source-identifying function such that Defendants' use of the mark in Dr. Breus's book title is expressive, rather than simply commercial use or advertising for his non-fiction work.  To show that *Rogers* applies to their allegedly infringing title and associated marketing, Defendants rely principally on the fact that The Power of When is a book, and cite the book's "substantial amount of creative expression," including Dr. Breus's "decision to name the four chronotypes after animals." Docs. 76 at 14; 91 at 8-9.  But this evidence addresses the book's contents, not whether the book's title is expressive or artistic.  That the First Amendment protects books generally,

or that Dr. Breus's book may have some creative elements, does not answer the question. As *Rogers* itself recognized, "[p]oetic license is not without limits.  The purchaser of a book, like the purchaser of a can of peas, has a right not to be misled as to the source of the product." *Rebelution*, 732 F. Supp. 2d at 888 (quoting *Rogers*, 875 F.2d at 997).  Indeed, "[books] are sold in the commercial marketplace like other more utilitarian products, making the danger of consumer deception a legitimate concern that warrants some government regulation." *Id.* (quoting *Rogers*).

Defendants cite no evidence that Plaintiffs' Power of When mark has "transcend[ed] [its] identifying purpose," "enter[ed] public discourse and become an integral part of our vocabulary," "assume[d] [] cultural significance," been imbued "with a meaning beyond its source-identifying function," or "evinces an intent to convey a particularized message" that "would [likely] be understood by those who viewed it." *Walking Mountain Prods.*, 353 F.3d at 807; *MCA Records*, 296 F.3d at 900; *Gordon*, 909 F.3d at 268.  In other words, no evidence shows that Dr. Breus's allegedly infringing use of The Power of When as a title is an expressive, creative, or artistic choice, rather than ordinary commercial speech that describes the content of his non-fiction self-help book.  *See Rebelution*, 732 F. Supp. 2d at 888; *Hush Hush Sound*, 2018 WL 4962086, at *3; *cf. Charles v. City of Los Angeles*, 697 F.3d 1146, 1151 (9th Cir. 2012) ("Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where the speech is an advertisement, the speech refers to a particular product, and the speaker has an economic motivation.").

With no demonstrated independent expressive, artistic, or cultural meaning apart from its content-describing function, Defendants' use of The Power of When falls within traditional trademark concerns of consumer deception and confusion as to Plaintiffs' mark, and implicates none of the First Amendment concerns that *Rogers* was adopted to safeguard.  *See Rebelution*, 732 F. Supp. 2d at 888 ("[Because] neither the word nor the mark have 'taken on an expressive meaning apart from its source-identifying function,' *MCA Records*, 296 F.3d at 900, no First Amendment rights are implicated and the *Rogers*

test is inapplicable."). The Court concludes, therefore, that *Rogers* is inapplicable to Plaintiffs' unfair competition and trademark infringement claims.[9] The Court will not grant summary judgment on this basis, and declines to address the parties' arguments under the *Rogers* analysis.

### F.    Unfair Competition under Arizona Law.

Arizona's common law doctrine of unfair competition "encompasses several tort theories, such as trademark infringement, false advertising, 'palming off,' and misappropriation." *SellPoolSuppliesOnline.com LLC v. Ugly Pools Ariz. Inc.*, No. CV-15-01856-PHX-BSB, 2017 WL 6420464, at * 14 (D. Ariz. June 9, 2017). "Under Arizona law, 'the ultimate question' for unfair competition is always whether trade is being unfairly diverted, and whether the public is being cheated into the purchase of something which it is not in fact getting; the courts interfere solely to prevent deception." *Great Am. Duck Races Inc. v. Kangaroo Mfr. Inc.*, No. CV-17-00212-PHX-ROS, 2019 WL 3238469, at *10 (D. Ariz. July 18, 2019) (citation and quotation marks omitted).

Plaintiffs' complaint alleges that the "acts of Defendants amount to an unauthorized interference with the normal operation of IOW and WEC's business [to] divert a material portion of the profit," giving Defendants the advantage of not having to develop original content. Doc. 1-1 at 12-13. Defendants develop no unique arguments regarding Plaintiffs' state law unfair competition claim, asserting only that "the *Rogers* test applies equally" to the claim. Doc. 76 at 16. As discussed above, however, *Rogers* is inapplicable. Defendants also reassert their priority argument, and the Court will not grant their motion on this basis for the reasons explained above. The Court will deny summary judgment on this claim.

---

[9] Defendants argue that their promotional efforts are protected by the First Amendment as an extension of their protected use of The Power of When. Doc. 76 at 14-15. The Ninth Circuit has held that while "promotional efforts technically fall outside the title or body of an expressive work, it requires only a minor logical extension of the reasoning of *Rogers* to hold that works protected under its test may be advertised and marketed by name." *Twentieth Century Fox*, 875 F.3d at 1196-97. But Defendants have not shown that their title is an expressive work, and develop no other argument for why their promotional activities should receive First Amendment protection.

1

### G.    Summary.

The Court will grant summary judgment in favor of Defendants on Plaintiffs' claims for breach of contract, breach of the implied covenant of good faith and fair dealing, misappropriation of trade secrets, and unjust enrichment (Counts 1-4).

Plaintiffs concede later in their papers as a "judicial admission" that Defendants' trademark The Power of When "is not confusingly similar to and does not infringe" their FYW or Life Can Be Better marks (Doc. 81 at 5), and Defendants accordingly seek partial summary judgment on Counts 5 and 6 on this ground.  Based on this concession, the Court will grant partial summary judgment in favor of Defendants: that their The Power of When mark does not infringe and is not confusingly similar to Plaintiffs' FYW and Life Can Be Better marks, but will deny summary judgment in all other respects on Plaintiff's claims for trademark infringement and unfair competition (Counts 5-6).

### IV.    Defendants' Counterclaim.

Defendants move for summary judgment on their counterclaim seeking to cancel several of WEC's trademark registrations.  Doc. 79.  WEC cross moves.  Doc. 81.

The counterclaim is not in the Court's docket.  It appears that the counterclaim was filed before this case was removed from state court because, only seven days after removal, the parties stipulated to extend the deadline for responding to the counterclaim.  Doc. 9.  But the counterclaim cannot be located in the papers attached to the notice of removal (Doc. 1) and Defendants' motion does not cite to the counterclaim in the docket (Doc. 79).  Because Plaintiffs do not dispute the nature of the counterclaim as described in Defendants' motion, the Court will address the motion.  The parties should remedy this defect in the docket promptly.

### A.    Undisputed Facts.

Defendants and WEC agree on the following.  *See* Docs. 80; 82 at 2-3.  WEC owns fourteen federally-registered trademarks, all covering "personal growth and motivation consulting services" ("the Registered Trademarks").  The Registered Trademarks were

filed as "intent to use" applications under 15 U.S.C. § 1051(b), and statements of use were filed with the U.S. Patent and Trademark Office ("PTO") on the following dates.

| Registered Mark and Registration Number | Alleged Date of First Use of Mark In Commerce | Date Statement of Use Filed with USPTO |
|---|---|---|
| FYW (4989579) | 12/18/2015 | 2/4/2016 |
| LIFE CAN BE BETTER (5177872) | 12/13/2016 | 1/25/2017 |
| WHENSDAY (5105635) | 1/21/2016 | 2/4/2016 |
| WHEN IS NOW (4937814) | 12/18/2015 | 2/7/2016 |
| WHEN WAY OF LIFE (4994021) | 12/18/2015 | 2/7/2016 |
| FIND YOUR WHEN (4937110) | 12/18/2015 | 2/4/2016 |
| WHEN ADVISOR (4937104) | 1/5/2016 | 2/5/2016 |
| MYWHEN (4983678) | 4/13/2016 | 4/28/2016 |
| WHEN CAREER ADVISOR (5161586) | 5/26/2016 | 2/27/2016 |
| WHEN HEALTH ADVISOR (5161586) | 4/13/2016 | 4/28/2016 |
| WHEN ZEN (5060177) | 7/7/2016 | 7/20/2016 |
| WHENNESS PROGRAM (5008777) | 4/13/2016 | 4/28/2016 |
| WHEN (4994111) | 1/1/2015 | 1/31/2016 |
| POWER OF WHEN (5233930) | 12/13/2016 | 4/10/2017 |

WEC's advisors were not trained on matters relating to these marks until the Fall of 2016, and members of a beta test that presumably used services related to the marks did not complete surveys until 2017 and 2018. WEC produced a WHEN member status page showing no activity earlier than June 30, 2017, and produced communications with members of the beta test group in 2017. WEC's March 2017 press release stated that "Plans

for WHENZEN facilities will be unveiled in mid-2017."  WEC's marketing materials claim that the global market for its services is $1.9 trillion.

**B.    Standing.**

WEC argues that Defendants lack standing to seek cancellation of the FYW and Life Can Be Better marks because WEC does not claim that Defendants infringed those marks, and WEC concedes that Defendants' trademark The Power of When is not confusingly similar to and does not infringe those marks.  Doc. 81 at 5.  But "[s]tanding is determined by the facts that exist at the time the complaint is filed."  *Clark v. City of Lakewood*, 259 F.3d 996, 1006 (9th Cir. 2001).  Although Plaintiffs have recently dropped their claim that Defendants infringe the FYW and Life Can Be Better marks, Plaintiffs originally asserted all 14 registered marks against Defendants.  Doc. 1-1.  Defendants therefore have standing to challenge the validity of all 14 marks.

**C.    Validity of WEC's Registered Trademarks.**

Defendants argue that WEC's marks are void because they were not in use when WEC filed its statements of use.  Doc. 79 at 6-9.  The parties dispute the applicable standard for determining when marks are in use for purposes of registration.  Defendants acknowledge that the Ninth Circuit uses a totality-of-the-circumstances test to determine what constitutes sufficient use to establish priority of rights.  Doc. 79 at 7.  But they assert that, for purposes of trademark registration, an owner must actually render services within the statutory period, citing *Couture v. Playdom, Inc.*, 778 F.3d 1379, 1382 (Fed. Cir. 2015). *Id.*  WEC responds that the totality-of-the-circumstances test applies when determining whether use supports valid registration.  Doc. 81 at 6.

**1.    Applicable Standard.**

"Under the [Lanham] Act, the owner of a trademark used in commerce may register the mark with the PTO."  *Gordon*, 909 F.3d at 263 (citing 15 U.S.C. § 1057(b)).  As part of the application, an owner must show the mark's use in commerce in connection with the services listed in the application, and may assert that the mark is already in use to satisfy the requirement.  *See* 15 U.S.C. § 1051(a).  If the mark is not in use, an owner with "a bona

1    intention" to use the mark must within six months file a declaration that "the mark is in use

2    in commerce and specifying the date of the [owner]'s first use of the mark in commerce

3    and those goods or services specified in the notice of allowance on or in connection with

4    which the mark is used in commerce." *Id.* § 1051(b)(1)-(3), (d)(1).

5        "Use in commerce" is defined in the relevant statute as "the bona fide use of a mark

6    in the ordinary course of trade, and not made merely to reserve a right in a mark."  15

7    U.S.C. § 1127; *see also Chance*, 242 F.3d at 1156-57 (discussing Congress' 1988

8    amendment passing stricter standards for finding use).  For goods, "a mark is in 'use in

9    commerce' when (1) the mark has been placed on the goods or their containers, labels or

10   the documents associated with the goods or their sale, *and* (2) the goods are 'sold or

11   transported in commerce.'" *Karlstorz Endoscopy AM., Inc. v. Surgical Techs., Inc.*, 285

12   F.3d 848, 855 (9th Cir. 2002) (emphasis added) (citing 15 U.S.C. § 1127).  For services, a

13   mark is deemed to be in use when "it is used or displayed in the sale or advertising of

14   services and the services are *rendered in commerce*." 15 U.S.C. § 1127 (emphasis added).

15   Thus, "[f]or both goods and services, the 'use in commerce' requirement includes (1) an

16   element of actual use, and (2) an element of display." *Chance*, 242 F.3d at 1159 (citing

17   § 1127).

18       As discussed above, the Ninth Circuit applies a totality-of-the-circumstances test to

19   determine common law priority of trademark rights, weighing a number of factors.  *See*

20   *id.*; *Rearden*, 683 F.3d at 1203-05 (discussing caselaw and "threshold requirement" of

21   showing first use); *see also* 2 McCarthy on Trademarks § 16:13.  In adopting this test for

22   disputed priority, the Ninth Circuit purported to be defining whether a service has "actually

23   been 'rendered in commerce'" under § 1127 of the Lanham Act.  *See Chance*, 242 F.3d

24   at 1159.  But § 1127's definition for "use in commerce" is also the statutory definition

25   available for § 1051's registration provisions.  The Ninth Circuit did not distinguish

26   between use that establishes common law priority rights and use that supports federal

27   trademark registration.

28

Courts and commentators recognize that "[t]here are two different standards of 'use' depending on whether the issue is the kind of 'use' which will . . . support the validity of a trademark registration," termed "actual use," or which will "establish priority of use over a rival which results in ownership of the disputed mark," called "analogous use." 2 McCarthy on Trademarks § 16:14. "To be a basis for federal registration as a trademark, . . . a mark [must *actually be*] used on or in connection with the goods [or services]." *Id.* Although "the analogous use doctrine, where it applies, eases the technical requirements for trademarks and service marks [in cases where a claimant] asserts *priority* on the basis of earlier analogous use of the mark[,]" the doctrine "has not been stretched so far as to obviate the requirement that [a party] show *eventual* actual use" for purposes of registration. *Am. Express Co. v. Goetz*, 515 F.3d 156, 161-62 (2d Cir. 2008) (emphasis added); *see Seal Shield*, 2014 WL 11350295, at *3-*7 (discussing analogous versus actual use and noting the Ninth Circuit's totality-of-the-circumstances test, but stating that "the Ninth Circuit most often applies this test to determine whether pre-sales activities are sufficient to establish proprietary rights"); *FN Herstal SA v. Clyde Armory Inc.*, 838 F.3d 1071, 1080-82 (11th Cir. 2016) (differentiating between analogous use to establish priority and actual sales, citing McCarthy on Trademarks).

Despite these distinct use requirements, WEC urges the Court to apply the totality-of-the-circumstances test to determine whether it has actually used its trademarks under § 1051. The cases cited by WEC all apply the Ninth Circuit's totality-of-the-circumstances test to determine common law priority of trademark rights, and include no cases applying this more flexible approach to determine whether a registered trademark owner has actually provided services sufficient to support federal statutory registration. *See* Doc. 81 at 6-7; *Chance*, 242 F.3d at 1156 ("the primary issue we deal with here is one of priority of use"); *Rearden*, 683 F.3d at 1203 (discussing "threshold requirement" and stating that the "standard test of ownership is priority of use"); *Brookfield*, 174 F.3d at 1053 (discussing "seniority" of rights); *Kythera Biopharmaceuticals, Inc. v. Lithera, Inc.*, 998 F. Supp. 2d

890, 900 (C.D. Cal. 2014) (ruling on motion to dismiss citing *Chance*, *Rearden*, and *Brookfield*, not clearly distinguishing between use to support priority or registration).

Moreover, many courts and the McCarthy treatise have recognized the difference between use that supports priority and use needed for registration, and have found that actual use of a mark is required for registration even if a lesser showing establishes priority. This distinction makes sense under general trademark law because an owner of an unregistered trademark has common law rights different from a registered owner's rights. Indeed, "cancellation of a trademark registration does not necessarily translate into abandonment of common law trademark rights." *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1391 (Fed. Cir. 2010); *see also Halicki*, 547 F.3d at 1226 (differentiating between ownership of an unregistered trademark versus registered). And while registration confers certain legal rights (logically requiring a higher showing of actual use), "[r]egistration does not create a mark or confer ownership; only use in the marketplace can establish a mark." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 979 (9th Cir. 2006); *see also Matal v. Tam*, 137 S. Ct. 1744, 1752-53 (2017) ("Without federal registration, a valid trademark may still be used in commerce . . . Federal registration, however, confers important legal rights and benefits[.]" (internal quotations omitted)).

Thus, although the Ninth Circuit applies the totality-of-the-circumstances test to establish priority, and adopted this test by purporting to interpret § 1127, it seems clear that the totality-of-the-circumstances test should not apply when determining whether a trademark owner has "used" her trademark for purposes of federal registration under § 1051. *Cf. Halicki*, 547 F.3d at 1226 ("It is axiomatic in trademark law that . . . the party claiming ownership must have been the first to *actually use* the mark in the sale of goods or services.") (emphasis added). Under the statutory definition of "use in commerce," the Court would find registration valid only if an applicant's statement of use shows that (1) the mark is *actually being used* in the ordinary course of the services trade, "not merely to reserve a right in the mark," and that (2) the mark is being "used or displayed in the sale or advertising of the services [which actually] are rendered in commerce."   15 U.S.C.

- 28 -

§§ 1051(d)(1), 1127 (emphasis added); *see Couture*, 778 F.3d at 1281-82 (collecting cases and citing McCarthy on Trademarks, stating "[t]o qualify for registration, the Lanham Act requires that the mark be both used in the sale or advertising of services and that the services themselves have been rendered"); *Buti v. Perosa, S.R.L.*, 139 F.3d 98, 103 (2d Cir. 1998) (federal registration rights "exist[] only 'as a right appurtenant to an established business or trade in connection with which the mark is employed'"); *cf. Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 936 (9th Cir. 2006) ("Section 1127 thus provides that 'use' of a trademark defeats an allegation of abandonment when: the use includes placement on goods sold or transported in commerce; is bona fide; is made in the ordinary course of trade; and is not made merely to reserve a right in a mark.").

The Court is constrained, however, by the Ninth Circuit's holding in *Chance*, which cited § 1127's "use in commerce" definition and announced the totality-of-the-circumstances test for "distinguish[ing] whether a service has actually been 'rendered in commerce.'" *Chance*, 242 F.3d at 1159. *Chance* explicitly recognized that its totality-of-the-circumstances test for "the 'use-in-commerce' requirement of § 1127" is "more flexible than the approaches taken by other courts." *Id. Chance* did not limit its holding to the priority context, and purported to interpret § 1127, the section which the Court must look to for the meaning of "use in commerce" for purposes of registration. The Court will therefore apply the totality-of-the-circumstances test to determine whether WEC has rendered its services in commerce to support valid trademark registrations under § 1051.

## 2. WEC's Evidence of Use.

WEC asserts that it had genuine, commercial, pre-sales activities before it launched its business, including presenting its service offerings to 10-15 prospective customers in Powerpoint presentations and in online and in-person meetings; creating branded apparel and websites; creating and distributing sales materials; creating and using training manuals and customer tools, including health journals; creating and marketing various service levels; raising investor capital; getting evaluations of trainings, performing beta tests and compiling surveys; and issuing press releases. Doc. 82 at 5-6. WEC asserts that it "used

the marks in a sufficiently public manner in its pre-sales activities to identify and distinguish its services," specifically in its presentations and press releases.  Docs. 81 at 8; 82 at 6.  Defendants contend that WEC's "pre-sales activities are insufficient" under an actual-use analysis, but do not appear to controvert these factual assertions or the supporting evidence.  *See* Doc. 92 at 7-8.  Rather, all of Defendants' arguments rely on the stricter actual-use test and WEC's activities after launching.  *See* Docs. 79; 92 at 1-10.  Defendants argue that if the Court applies a totality-of-the-circumstances analysis, disputes of fact exist regarding whether Plaintiffs' pre-sales activities were sufficient to support registration.  Doc. 92 at 10.

WEC cites Miller's declaration that on December 14, 2016, WEC conducted an online interactive team meeting with a prospective client using a document that bore the Power of When mark.  *See* Doc. 82-1 at 2.  Miller avers that IOW – which he solely owns – rendered personal growth and motivation consulting services for fees from 2013 through 2017, that he rendered free services in 2014 and 2015, that WHEN Advisors were trained in Fall 2016, and that WEC used the marks in actual sales after its launch.  *Id.* at 2-3.  WEC's training schedule from September 2016 repeatedly includes the WHEN mark, and the 2016 Training Manual includes Find Your When.  *See* Doc. 82-6.  WEC's other cited evidence, which appears to include internal documents and promotional materials, contains references to the other registered marks, including WHENness, WHEN Advisor, WHEN Way of Life, WHEN is Now, MyWHEN, and FYW.  *See* Doc. 69-1 at 8, 16, 19, 24, 46.

The Ninth Circuit's test specifically instructs the Court to consider pre-sales activities in determining whether a trademark owner uses its marks in connection with services rendered in commerce.  *Chance*, 242 F.3d at 1159; *see Rearden*, 683 F.3d at 1204-06.  If the totality-of-the-circumstances test is applied, Defendants do not dispute that WEC's pre-launch activities create issues of fact about whether WEC's activities distinguished the marked services and were a commercially reasonable attempt to market their services.  Doc. 92 at 11.

1    WEC contends it is entitled to summary judgment based on this evidence, but the

2    Court notes again that the totality-of-the-circumstances test is highly fact-intensive. *See*

3    *Rearden*, 683 F.3d at 1208.  Viewing the evidence in Defendants' favor for purposes of

4    WEC's motion, the Court concludes that a jury reasonably could find that the nature and

5    extent of WEC's pre-launch activities were insufficient to identify its marks and services

6    to an appropriate segment of the public were and not a commercially reasonable attempt to

7    market their services.  *Chance*, 242 F.3d at 1159; *Rearden*, 683 F.3d at 1204-06.

8    The Court will deny both motions as to Defendants' counterclaims.  *See Anderson*,

9    477 U.S. at 248.

10   **IT IS ORDERED**:

11   1.    Defendants' motion for summary judgment on Plaintiffs' claims (Doc. 76) is

12   **granted in part and denied in part.**  Judgment is entered in favor of Defendants on

13   Plaintiffs' claims in Counts 1-4, and on Counts 5 and 6 with respect to Plaintiffs' FYW and

14   Life Can Be Better marks.  Judgment is denied as to Counts 5 and 6 in all other respects.

15   2.    Defendants' motion for summary judgment on its counterclaims (Doc. 79),

16   and Plaintiffs' cross-motion (Doc. 81), are **denied**.

17   3.    Plaintiffs' unopposed motion to file exhibits under seal (Doc. 88) is **granted**.

18   The Clerk is directed to accept for filing the documents lodged under seal at Docs. 89, 90.

19   4.    The Court will hold a telephone conference to set a trial date and a final

20   pretrial conference on **September 3, 2019 at 4:00 p.m.**  Counsel for Plaintiffs shall initiate

21   a conference call to include counsel for all parties and the Court.  If a dial-in number is to

22   be used, counsel for Plaintiffs shall provide the dial-in information to counsel for all parties

23   and the court no later than 12:00 noon on August 30, 2019.

24   Dated this 26th day of August, 2019.

25

26

27

28

David G. Campbell
Senior United States District Judge